## APPEAL OF J. J. GRAY, JR.

Docket No. 716.    Submitted July 6, 1925.    Decided September 28, 1925.

1. The March 1, 1913, value of a patent is a proper basis for computing the allowance for the exhaustion of the patent where that value is greater than cost.

2. In 1906 the taxpayer was granted a patent upon a process for the manufacture of ferro-phosphorus in a blast furnace. *Held*, that its value on March 1, 1913, was $850,000.

*Jesse I. Miller, Esq.*, for the taxpayer.
*A. R. Marrs, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, MARQUETTE, SMITH, STERNHAGEN, TRUSSELL, and GREEN.

This appeal involves a deficiency in income and profits tax for the years 1918 and 1919 in the amounts of $54,177.37 and $18,051.10, respectively.

### FINDINGS OF FACT.

1. The taxpayer is a resident of Rockdale, Tenn., and during the years 1918 and 1919, and prior and subsequent thereto, was engaged in manufacturing and selling ferro-phosphorus under a process conceived by him in 1904, and covering which there was issued to him on September 18, 1906, United States Letters Patent No. 837427. The patent expired September 17, 1923.

2. Ferro-phosphorus is an alloy of iron and phosphorus which is used for the purpose of rephosphorizing open-hearth steel when

such steel is to be used for sheets and plate. Prior to the beginning of the twentieth century, practically all steel made in the United States was manufactured under what is known as the Bessemer process. Without elaborating the details of that process, it is sufficient to say that the process eliminates from the finished steel practically all of the impurities of the iron ore; that is, silicon, carbon, manganese, etc., with the exception of phosphorus. Under this process, however, it is impossible to eliminate from the steel any of the phosphorus content in the iron ore. Steel which contains more than 0.08 per cent of phosphorus is too brittle for most purposes, although a slightly higher phosphorus content still leaves it fit for certain commercial uses. In the manufacture of steel under the Bessemer process, therefore, it has always been necessary to select the ores to be used in order to secure ores which will not produce a steel with such a high phosphorus content as to make it unfit for general commercial use.

Toward the close of the nineteenth century iron ores in the United States fit for treatment by the Bessemer process were being rapidly depleted, although vast deposits still remained containing phosphorus in percentages too high to permit of their treatment by the Bessemer process.

3. Around the beginning of the twentieth century a process for the manufacture of steel by the "open hearth" method made its appearance in the United States. By this process practically all of of the phosphorus content in the iron ore is removed, as well as all other impurities, so that, regardless of the percentage of phosphorus found in the ore, steel manufactured by the open-hearth method contains only a negligible percentage of phosphorus. The open-hearth method, therefore, immediately made available for commercial use the tremendous deposits of iron ores in the United States the phosphorus content of which was too high to permit of their commercial utilization when treated in Bessemer furnaces.

4. Because of this situation and of the further fact that a more uniform steel can be made in the open hearth than in the Bessemer furnace, the production of open-hearth steel in the United States began rapidly to increase, beginning around the year 1906, while the production of Bessemer began, about the same time, to remain stationary or to fall off. During the period 1909 to 1913 the production of open-hearth steel in the United States increased from 13,400,-000 tons in round numbers to 20,344,000 tons per annum, or an increase of over 50 per cent, whereas during the same period the production of Bessemer steel increased from 9,330,000 tons to only 9,545,000 tons, or only about 2 per cent.

From 1913 to 1916 open-hearth production jumped from 20,344,000 tons to 29,000,000 tons in round numbers, an increase of approximately 45 per cent, while only 11,000,000 tons of Bessemer were produced in 1916 as against 9,545,000 tons in 1913. By 1923 open hearth had so far displaced Bessemer steel in the United States that the production of the former for that year was 34,665,000 tons, while only 8,484,000 tons of Bessemer were produced. In other words, between 1909 and 1923 the production of open-hearth steel in the United States had increased from 13,000,000 tons to over 34,000,000 tons per annum, an increase of more than 250 per cent, whereas the production of Bessemer decreased from 9,330,000 tons in 1909 to 8,484,000 tons in 1923.

5. By the end of the first decade of the twentieth century it was apparent and well known to the steel industry, by reason of the situations indicated above, that the manufacture of steel in the United States by the open-hearth method had steadily and rapidly increased and that additional and accelerated increases in open-hearth production and in the use of open-hearth steel for making sheet and plate would occur during the following decade.

6. "Sheet" is a product made by rolling steel bars into sheets of steel of desired thickness. "Plate" is similar to "sheet," except that it is rolled thicker.

7. In the manufacture of "sheet" from two to six steel bars are rolled at the same time in a "pack." The result of this rolling is to produce a similar number of steel sheets lying one on top of the other. The sheets are then pulled apart and allowed to cool. In the production of sheets from Bessemer bars, sheets are readily separated. In making sheets from open hearth, however, it was found that the sheets stuck together in the pack and could not be readily, or at times at all, pulled apart. Experimentation around the beginning of the twentieth century disclosed that the different results in the case of Bessemer and open-hearth steel were due to the fact that the Bessemer contained phosphorus and the open hearth did not. It was also discovered that open-hearth steel was not adaptable for rolling into sheet and plate unless and until there was added back to it a certain amount of phosphorus, all the phosphorus having been removed from the steel in its manufacture in the open hearth.

8. Until the year 1904 no phosphorus alloy adaptable for use in rephosphorizing steel was known except ferro-phosphorous produced in Germany in electric furnaces. A small amount of this alloy had been brought into the United States, for experimental purposes only, prior to 1904 at a cost of about $100 per ton. Its manu-

facture was expensive. No means had then been discovered for its production in commercially profitable quantities.

9. In the year 1904, while the steel industry was just beginning to give serious attention to the manufacture of open-hearth steel suitable for sheets and plate, the taxpayer discovered a process for the manufacture of ferro-phosphorus in a blast furnace in a manner which made it appear probable that the alloy could be produced cheaply and in commercially profitable amounts. At that time he had no definite idea of the uses to which such alloy could be put or of the important part it was destined to play in the manufacture of sheet bars in the open hearth.

During the year 1904, however, having succeeded in manufacturing about 43 tons of ferro-phosphorus in his blast furnace, the taxpayer attempted, through his brokers, to interest the steel companies in its use. His efforts at first were unsuccessful and he was advised by his brokers that the steel industry saw no practical use for his product. However, in October or November of 1904 he received an order for 500 tons of the alloy from the Carnegie Steel Co. at $47.50 a ton. Realizing then that his process might eventually be valuable, the taxpayer, in November, 1904, filed an application for a patent on it and the patent finally issued in 1906.

10. From 1905 to 1910 the demand for the taxpayer's alloy began to increase and by 1910 he had succeeded in interesting in it all the steel companies in the United States who were making open-hearth steel. His orders were, however, small in amount and, in order to establish his product in the industry, he was compelled to sell it at a price very much below its real value and at less than one-half of what had been previously paid for imported ferro-phosphorus made in electric furnaces and introduced into the United States for experimental purposes.

By the end of the year 1911, however, the taxpayer's ferro-phosphorus was in more or less general use by all of the steel companies in the United States and its value at that time as a practical commercial proposition had been fairly well established. Meanwhile, the taxpayer's sales of ferro-phosphorus had steadily, though slowly, increased from 208 tons in 1906 to 5,512 tons in 1911.

In 1912 the taxpayer had considerable trouble with his furnaces and was compelled to do a great deal of work in keeping them fit for use, with the result that his earnings for that year fell off materially. In 1913 the taxpayer blew out his furnace and closed down his plant for the last six months of the year in order to make certain improvements and additions to his plant which grew out of the circumstances now to be recited.

11. While the taxpayer was, in the early years of his efforts to establish his product, only slightly acquainted with the executive heads of the steel industry, by 1910 and 1911 he had reached a stage of intimate personal acquaintance with many of them. These gentlemen about that time began to impress upon the taxpayer the fact that the production of open-hearth steel in the United States was steadily and rapidly increasing and that such increases bore a direct relation to the value of and necessity for his ferro-phosphorus alloy which was indispensable in making open-hearth steel fit for rolling into sheets and plate. They informed the taxpayer of the advisability of increasing the capacity of his plant in order to be able to take care of the increasing demand for his product, which, in view of the then trend of the steel industry, appeared to be certain. Beginning in 1911 the taxpayer accordingly began to make plans for enlarging his plant and continued those preparations during 1911 and 1912. During the latter part of 1913 he closed down his plant and devoted the last six months of that year to increasing its capacity to 13,000 tons per annum. This addition to his plant made during the last six months of 1913 was prompted entirely by the fact, then well known in the steel industry, that the production of open-hearth steel was rapidly increasing and that the demand for ferro-phosphorus would increase in somewhat similar proportions.

12. Having completed the additions and improvements to his plant by the first of the year 1914, the taxpayer resumed operations at the beginning of the latter year. In 1914 he sold 7,587 tons of ferro-phosphorus; in 1915, 10,347 tons, and in 1916, 13,128 tons.

13. Meanwhile, while the demand for ferro-phosphorus had been steadily increasing and the absolute necessity for its use in open-hearth bar had been well established, the taxpayer made very small increases in the price for which he sold his product. The tonnage sold and the prices received therefor during the period 1906 to 1916, both inclusive, are as follows:

| Year. | Tons sold. | Price. | Year. | Tons sold. | Price. |
|---|---|---|---|---|---|
| 1906 | 208 | $47. 50 | 1912 | 5, 750 | $47. 60 |
| 1907 | (1) | 50. 00 | 1913 | 4, 811 | 51. 40 |
| 1908 | 1, 228 | 47. 60 | 1914 | 7, 587 | 52. 50 |
| 1909 | 3, 308 | 47. 60 | 1915 | 10, 347 | 52. 50 |
| 1910 | 3, 547 | 47. 60 | 1916 | 13, 128 | 60. 00 |
| 1911 | 5, 512 | 47. 60 | | | |

1 Negligible amount sold in 1907.

14. The additions begun by the taxpayer in 1913 and contemplated for two years prior thereto were designed to bring his plant to a capacity of 13,000 tons per annum, which in 1913 was known to be a tonnage the use of which might reasonably be anticipated annually

in view of the rapid development in the manufacture of open-hearth steel. The period 1914 to 1916 immediately following the increase in the capacity of the taxpayer's plant and during which he worked gradually up to his full capacity was, in view of the circumstances existing and known in 1913 and years prior thereto, the first normal period of operation under circumstances known to exist in 1913.

15. By reason of the entrance of the United States into the World War in 1917, practically all open-hearth steel manufactured during 1917 and 1918 was requisitioned by the Government for ordnance purposes, with the result that very little open-hearth steel was available for sheets and plate.

16. The net income and net tangible assets of the taxpayer during the period of 1909 to 1923, both years inclusive, were as follows:

| Year. | Net income. | Net tangibles. | Year. | Net income. | Net tangibles. |
|---|---|---|---|---|---|
| 1909 | $38,388.30 | $98,058.34 | 1917 | $314,205.78 | $365,262.85 |
| 1910 | 24,674.05 | 132,060.06 | 1918 | 478,406.97 | 508,844.33 |
| 1911 | 108,137.87 | 157,189.66 | 1919 | 207,787.44 | 402,844.55 |
| 1912 | 84,769.94 | 246,348.53 | 1920 | 289,229.88 | 594,474.42 |
| 1913 | 43,951.50 | 281,990.63 | 1921 | 105,292.46 | 502,656.12 |
| 1914 | 109,147.81 | 303,390.84 | 1922 | 119,502.54 | 586,922.05 |
| 1915 | 145,926.45 | 414,288.38 | 1923 | 228,652.10 | |
| 1916 | 259,105.06 | 428,035.90 | | | |

17. During the summer and fall of 1916 the taxpayer was in negotiation with the International Agricultural Corporation, through its president, Stephen B. Fleming, looking to the purchase by the International Agricultural Corporation from the taxpayer of his plant and patent. After a thorough investigation of the patent and its possibilities, and after an appraisal of the physical assets, Fleming offered the taxpayer in November, 1916, for his plant and patent the sum of $2,000,000 cash. This offer was based upon the idea that, according to Fleming's accountants, the physical assets were worth approximately $320,000 and that the patent was worth the difference between that sum and $2,000,000, to wit, the sum of $1,680,000. As the result of the investigations conducted by Fleming at a time when the patent had only seven years of remaining life, Fleming concluded that it was possible, during the first five years after 1916, by increasing the price of ferro-phosphorus to a proper figure, to recover from the sale of ferro-phosphorus alone at least $2,000,000 and that the profit from the sale of ferro-phosphorus during the last two years of the life of the patent would be clear profit of operation. The taxpayer, however, rejected this offer of $2,000,000 upon the idea that, as a ferro-phosphorus proposition alone, the patent was worth $3,000,000, which amount he demanded for it.

18. In November, 1916, the plant appeared on the taxpayer's books at approximately $400,000, and the difference between $2,000,000,

the amount of the cash offer made for the plant and patent, and the plant's then book value, to wit, $1,599,744.40, was set up on the taxpayer's books at the close of 1916 as the value of the patent at that date. Thereafter, in his income-tax returns for the years 1917 to 1923, both inclusive, the taxpayer deducted annually as "exhaustion" of his patent one-seventeenth of the value placed on the books, or an annual deduction of $94,105.55.

The Commissioner, upon examination of taxpayer's returns for the years 1918 and 1919, held that the taxpayer was not under the law and regulations entitled to compute "exhaustion" of his patent upon the basis of a value in 1916 but that he was entitled to compute such "exhaustion" upon the basis of its fair market value at March 1, 1913. The Commissioner further held that the annual deduction should be one-tenth of such value, the patent having at March 1, 1913, a remaining life of ten years.

19. The Commissioner thereupon determined the fair market value of the patent at March 1, 1913, to be $457,939.70 and the annual deduction for its exhaustion over the ten remaining years of its life to be $45,793.97. In accordance with his determination, the Commissioner restored to the income of each of the years 1918 and 1919, as reported in taxpayer's returns, the excess of the deductions claimed therein as "exhaustion" of patents over the amount determined by him to represent a reasonable allowance.

The Commissioner's valuation of $457,939.70 as of March 1, 1913, as explained upon oral argument, was arrived at by employing what is known as the Hoskold formula. Briefly, that method is as follows:

He first determined that the average net income of the taxpayer at March 1, 1913, was $100,000 and that the average of net tangible assets employed in the business at the same date was $200,798. He assumed that 8 per cent was a fair return upon the tangible assets and therefore allocated earnings of $16,063.85 to tangible assets. The difference, to wit, $83,936.15 he determined to be the average earnings of the patent at March 1, 1913. At that date the patent had a remaining life of 10 years. The Commissioner, therefore, fixed the value of the patent at that date at a sum which represented the present worth of $83,936.15 received annually for 10 years. In applying the Hoskold formula the Commissioner further assumed that a purchaser of this annuity would expect to recover his investment through a sinking fund to which annual additions would be made and the sinking fund invested at 4 per cent interest compounded annually. He further assumed that a prospective purchaser, in addition to recovering his investment through this sinking fund, would demand a return of 10 per cent annually on his investment.

With these three bases, that is, an expected annual earning on the patent for 10 years at March 1, 1913, of $83,936.15, a sinking fund at 4 per cent, and an annual current return on the investment of 10 per cent, the Commissioner arrived at a value, by applying the Hoskold formula to these bases, of $457,939.70.

From all the evidence the Board finds the value of the patents in question on March 1, 1913, to have been $850,000, and the annual exhaustion thereof for the years in question is $80,563.49.

### DECISION.

The deficiency, if any, should be computed in accordance with the following opinion. Final determination will be settled on consent or on 15 days' notice, in accordance with Rule 50.

### OPINION.

SMITH: In each of his income-tax returns for 1918 and 1919, the taxpayer deducted from gross income for exhaustion of a patent $94,105.55. In the audit of the returns the Commissioner has disallowed so much of the claimed deduction as is in excess of $45,793.97. The Commissioner's allowance is based on a March 1, 1913, value of the patent of $457,939.70. The taxpayer contends that the value on March 1, 1913, was from $1,250,000 to $1,500,000.

Upon the hearing of this appeal counsel for the taxpayer was asked whether, in view of the recent decisions of the Supreme Court of the United States in the cases of *United States* v. *Flannery*, 268 U. S. 98; and *McCaughn* v. *Ludington*, 268 U. S. 106, the basis for the deduction of an amount representing the exhaustion of the patent here in question should be its cost, which was less than its fair market value on March 1, 1913, or the value on the last-named date. This inquiry was prompted by the fact that, if there had been a sale of the patent in either of the tax years in question, there would be no question but that any loss sustained therefrom based upon the March 1, 1913, value would not constitute a legal deduction from gross income in the year of sale, since the patent cost the taxpayer nothing when acquired in 1906; that since exhaustion or depreciation is a wasting of property and therefore in effect a *loss*, should not the depreciation deduction under the Revenue Act of 1918 be computed upon the basis of cost or value at March 1, 1913, *whichever is lower*, the same as a loss from the sale of property based upon a March 1, 1913, value of property acquired prior to that date?

The Revenue Act of 1918 permits a taxpayer corporation to deduct from gross income in income-tax returns " a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

Section 234 (a) (7). The statute is silent as to the basis upon which such reasonable allowance shall be computed. The Excise Tax Act of August 5, 1909, and the Revenue Acts of 1913 and 1916, and the Revenue Act of 1916 as amended by the Revenue Act of 1917, also contained provisions for the deduction of a reasonable allowance for depreciation or exhaustion of property, and they also are silent as to the basis upon which the allowance shall be computed.

In the interpretation of these acts, the Commissioner first held that the allowance for depreciation should be computed on cost. In Treasury Decision 2137, dated January 30, 1915, it was held:

In determining the cost of the real estate, in most cases no segregation is made of the cost of buildings as separate and distinct from the cost of the grounds upon which such buildings stand. In such cases, where the actual cost of the buildings or improvements at the time they were taken over by the corporation can not be definitely determined, it will be sufficient for the purpose of determining the rate of depreciation to be used in computing the amount which will be deductible from gross income to estimate the actual value of the buildings or improvements as of January 1, 1909, provided such buildings were in existence at that time, and provided that the value placed upon such buildings shall not be in excess of the cost of such buildings, less an amount measuring the depreciation which had previously been sustained.

In Treasury Decision 2152, dated February 12, 1915, it was provided:

The rule which this office has established and which is very generally followed by corporations contemplates that an allowable depreciation deduction within the meaning of the Federal income tax law shall be computed upon the basis of the cost of the property and the probable number of years constituting its life.

In Regulations 33 (Revised), promulgated January 2, 1918, it was provided that:

Art. 163. * * * In determining the cost of the real estate upon which depreciable property is located it frequently occurs that no segregation is made of the cost of buildings as separate and distinct from the cost of the ground. * * * In such cases where the actual cost of the buildings or improvements * * * can not be definitely determined, it will be sufficient for the purpose of determining the rate of depreciation to be used in computing the amount which will be deductible from gross income to estimate the actual value at the time acquired of buildings or improvements if acquired after March 1, 1913, or the fair market price or value as of that date if the property was acquired prior to March 1, 1913, the value in either case to be reduced by the amount of depreciation previously sustained.

Thereafter, to wit, on August 23, 1918, Treasury Decision 2754 was promulgated and provided as follows:

A reasonable allowance for the wear and tear of property arising out of its use of employment in the business or trade is to be based on the cost of such

property or on its fair market price or value as of March 1, 1913, if acquired prior thereto.

From the date of that Treasury Decision to the present time the Commissioner has permitted the deduction from gross income of the allowance for the exhaustion, wear and tear of property to be based on the March 1, 1913, value where the property was acquired by the taxpayer before that date.

As above indicated, the Revenue Act of 1918 does not establish any basis for the computation of the allowance for exhaustion, wear and tear of property. The allowance is not referred to in the Act as depreciation, which, literally speaking, is a "lessening in value." In Article 161 of Regulations 45, the Commissioner refers to the allowance for convenience as "depreciation" and has provided:

The proper allowance for such depreciation of any property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a consistent plan by which the aggregate of such amounts for the useful life of the property in the business will suffice, with the salvage value, at the end of such useful life to provide in place of the property its cost, or its value as of March 1, 1913, if acquired by the taxpayer before that date.

Is the allowance permitted by the statute a loss of the same character as a loss sustained by a taxpayer upon the sale of property and therefore to be computed subject to the rules of computation laid down by the Supreme Court in the cases of *United States* v. *Flannery*, and *McCaughn* v. *Ludington, supra?* In other words, is the basis for determining gain or loss laid down in section 202(a) of the Act also the basis for determining the allowance for exhaustion, wear and tear of property? Is the exhaustion of the property arising from its use in the trade or business a "disposition of property," within the meaning of the last-named section of the statute? We are of the opinion that it is not. Any detriment suffered by a taxpayer through exhaustion, wear and tear of property may be more than offset by appreciation in the market value of the property subject to the allowance. The taxpayer is, nevertheless, entitled under the rulings of the Commissioner, and we think correctly, to a deduction from gross income on account of the exhaustion, wear and tear of property. We think that Congress provided for this deduction by reason of the fact that exhaustion, wear and tear of property is a factor in the carrying on of a trade or business generally taken into account by business men on the computation of gains and profits. Cf. *Appeal of Even Realty Co.*, 1 B. T. A. 355.

As above indicated the statute provides for the deduction of a "reasonable allowance" for the exhaustion, wear and tear of property used in the trade or business. To the extent that this provision is applied to determine a deduction for exhaustion, wear and tear

of property where the property was acquired prior to March 1, 1913, and the value on that date was in excess of the depreciated cost on that date, we think it has been correctly interpreted by the Commissioner. In the appeal at bar the March 1, 1913, value was in excess of cost, and we think that the allowance for exhaustion may properly be computed upon that value.

The second question presented for the determination of the Board is the fair market value of the patent at March 1, 1913. What that value was is a question of fact which must be determined in accordance with the credible evidence presented to us. The Commissioner, resorting to Hoskold's formula, as outlined in the findings of fact, has determined that value to be $457,939.70. On the other hand, the taxpayer contends that the patent had a fair market value at the basic date of between $1,250,000 and $1,500,000.

In determining the value of assets at any basic date, the valuation should be based upon facts known at the time. Subsequent earnings can not be used in the determination unless from past experience or known facts such future earnings might reasonably have been anticipated. We are convinced that such was the situation in the case at bar. Our findings of fact, which need not be repeated here, lead inevitably to that conclusion. The taxpayer's business had passed far beyond the experimental stage at March 1, 1913. At that time the product manufactured under the patent was generally in use in the steel industry. The evidence conclusively demonstrates that ferro-phosphorus was an absolute essential in the process of rolling sheet and plate from steel refined in the open hearth, a method of refining which was rapidly replacing the Bessemer process. Moreover, it was upon representations of responsible executives engaged in the steel industry that the taxpayer long prior to March 1, 1913, laid plans to enlarge his plant to a capacity of 13,000 tons per annum, plans which were actually consummated in the latter part of 1913. By 1916 the market was absorbing his full capacity production.

From a consideration of all of the facts, we are of the opinion that the value of the patent at March 1, 1913, was $850,000 and that the annual exhaustion thereof for the years in question is $80,563.49.

ARUNDELL not participating.